United States District Court
Southern District of Texas
**ENTERED**
April 12, 2016
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| EMTEL INC., § | |
| Plaintiff, § | |
| § | |
| v. § | CIVIL ACTION NO. H-11-3007 |
| § | |
| MEDAIRE INC., § | |
| Defendant. § | |

## MEMORANDUM AND ORDER ON CLAIM CONSTRUCTION

This patent case is before the Court for construction of the disputed claim terms in United States Patent No. RE42,288 ("the '288 Patent"). The Court conducted a hearing pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996) ("*Markman* hearing"), on April 6, 2016. Based on the evidence before the Court, the arguments presented by counsel, and the governing legal authorities, the Court issues this Memorandum and Order construing those disputed claim terms that require construction.

**I.    BACKGROUND**

Plaintiff Emtel Inc. ("Emtel") is the owner of the '288 Patent, entitled "Emergency Facility Video-Conferencing System." The patent covers a medical video-conferencing system in which a physician in a central location can receive simultaneous audio-video transmissions from two or more medical facilities at

different locations.  The '288 Patent claims priority back to the original application filed on March 17, 2000.  The Patent was reissued in 2011.  The '288 Patent was reexamined by the United States Patent and Trademark Office ("USPTO") in 2012.  The USPTO initially rejected all of the claims as anticipated by and obvious in light of prior art publications.  In January 2014, the USPTO on reconsideration confirmed the patentability of all claims in the '288 Patent.

Emtel sued Defendant MedAire Inc. ("MedAire") alleging infringement of Claims 4-8 and 12-15.  Emtel filed an Opening Claim Construction Brief [Doc. # 115], MedAire filed a Responsive Claim Construction Brief [Doc. # 116], Emtel filed a Reply Brief [Doc. # 118], and the parties filed a Joint Claim Construction Chart [Doc. # 121].  The disputed claim terms include two variations of the term "video-conferencing station."  Also in dispute are the claim terms "audio-video conferencing communication link" and "video-conferencing communication link."  There are several disputed terms relating to "facilities" and "satellite facilities," and other disputed terms relating to different types of "care givers."  A final group of disputed terms involve the control of a remote-control camera by the physician at the video-conferencing station.  Emtel asserts some of these terms require no construction, but provides a proposed construction of the terms should the Court find that construction is necessary.  MedAire has proposed a different construction of each disputed term.

The Court conducted a *Markman* hearing regarding the disputed claim terms, and now issues this claim construction ruling.

## II.    GENERAL LEGAL STANDARDS FOR CLAIM CONSTRUCTION

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Aventis Pharm., Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*)).  The patent claims in issue must be construed as a matter of law to determine their scope and meaning.  *See, e.g., Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996); *Schindler Elevator Corp. v. Otis Elevator Co.*, 593 F.3d 1275, 1281 (Fed. Cir. 2010); *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1317 (Fed. Cir. 2007).

"There is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis*, 715 F.3d at 1373 (citing *Phillips*, 415 F.3d at 1312-13; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  Therefore, Courts must "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted); *see also Summit 6, LLC v. Samsung Elec. Co., Ltd.*, 802 F.3d 1283, 1290 (Fed. Cir. 2015).  The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the

effective filing date of the patent application." *Phillips*, 415 F.3d at 1313; *see also ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1374 (Fed. Cir. 2009).  This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313; *ICU*, 558 F.3d at 1374.

Intrinsic evidence is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips,* 415 F.3d at 1312). For certain claim terms, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314.  For other claim terms, however, the meaning of the claim language may be less apparent.  To construe those terms, the Court considers "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean . . . [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."  *Id.*

The claims "provide substantial guidance as to the meaning of particular claim terms." *Id.* The Court may consider the context in which the terms are used and the differences among the claims. *See id.* "Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.* Because the claims "are part of a fully integrated written instrument," the Court may also consider the specification and the patent's prosecution history. *Id.* at 1315, 1317; *see also Trustees of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1362-63 (Fed. Cir. 2016). When the claims use separate terms, "each term is presumed to have a distinct meaning." *Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841, 847 (Fed. Cir. 2006).

The doctrine of prosecution disclaimer requires that "the claims of a patent be interpreted in light of the proceedings in the PTO during the application process." *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1063 (Fed. Cir. 2016) (citing *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 733 (2002)). Specifically, "the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention." *Id.* (quoting *Phillips*, 415 F.3d at 1317). "Any explanation, elaboration, or qualification presented by the inventor during patent examination is relevant, for the role of claim construction is to

capture the scope of the actual invention that is disclosed, described, and patented." *Id.* (quoting *Fenner Invs., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1323 (Fed. Cir. 2015)).

### III.  CONSTRUCTION OF DISPUTED CLAIM TERMS

As to the disputed claim terms in the Amended Joint Claim Construction Chart [Doc. # 33], the Court has carefully reviewed the '288 Patent, specifically its claims and specifications, and the prosecution history. The Court also has considered counsels' arguments presented at the *Markman* hearing, and governing Federal Circuit authority. On this basis, the Court construes the following disputed terms in the claims of the '288 Patent.

#### A.  Claim Terms Relating to a "Video-Conferencing Station"

The term "video-conferencing station" is used in claims 1, 4, 6-10, 12, 13, 15, 16, and 18-20. For example, Claim 4 requires an emergency room physician at an "emergency medical video-conferencing station" linked to separate emergency care facilities. Similarly, independent Claim 12 requires a "central medical video conferencing station" linked to separate satellite emergency medical care facilities. The parties disagree whether these claim terms refer to a location or to a collection of pieces of equipment necessary to engage in video-conferencing. Emtel proposes that the term be construed to require a building or establishment from which medical

services are provided through video conferencing. MedAire proposes that the term be construed to describe the equipment that is necessary to provide video-conferencing between individuals at the separate medical facilities and the physician at the central location.

There is nothing in the '288 Patent that suggests that the term "video-conferencing station" is a building or establishment. Indeed, at the *Markman* hearing, Emtel conceded that the "video-conferencing station" does not need to be an actual building or establishment. There also is nothing in the '288 Patent that suggests, as MedAire urges, that the "video-conferencing station" is merely a collection of equipment.

Having reviewed the '288 Patent and having considered the parties' arguments, the Court construes the term "video-conferencing station," whether in the term "central medical video-conferencing station" or "emergency medical video-conferencing station," to mean a location from which medical services are provided through video-conferencing technology.

    **B.**     **Claim Terms Relating to a "Video-Conferencing Communication Link"**

The '288 Patent discloses an "audio-video conferencing communication link" in Claims 9 and 15, and a "video-conferencing communication link" in Claims 4 and 12. MedAire argues that each of these claim terms should be construed to require

live streaming two-way audio and video signals between the medical video-conferencing station and the separate medical facilities. MedAire notes that the patent examiner's statement of reasons for allowing the reissuance of the '288 Patent contains the following: "This invention relates generally to the field of video-conferencing wherein a *two-way* video and audio system is provided enabling one or more parties at one location to be in communication with one or more parties at another location." *See* Notice of Allowability, Exh. 8 to MedAire's Responsive Claim Construction Brief, p. 2 (emphasis added). Emtel disputes that the claim terms require live streaming two-way video. Emtel concedes that the claim terms require two-way audio signals.

Claims 4, 12, and 15 of the '288 Patent each provide for a video-camera at a minimum of two "emergency care facilities" (Claims 4 and 12) and at the "satellite medical facilities" (Claim 15). There is no similar limitation in these Claims requiring a video-camera at the video-conferencing station where the physician is located. Therefore the Court construes "audio-video conferencing communication link" to require a connection that allows two-way audio signals between a central station and a remote medical facility, and at least one-way video signals from the remote medical facility to the station. The Court similarly construes the claim term "video-conferencing communication link" to require a connection that allows at least one-way

video signals from a medical facility to a separate central station. The claim terms do not require two-way video signals.

MedAire also argues that the video signals must be live streaming. The term "live streaming" is neither used nor defined in the '288 Patent, and there is no evidence that the concept of "live streaming" video was known to those skilled in the art at the time of the original patent application in 2000. Having considered the '288 Patent and the parties' arguments on claim construction, the Court concludes that the terms "audio-video conferencing communication link" and "video-conferencing communication link" do not require that the audio and video signals be "live streaming."[1]

### C.    Claim Terms Relating to "Facilities" and "Satellite Facilities"

Claims 1-4, 6, 8-9, 11-13, 15, and 17-19 in the '288 Patent refer to an "emergency care facility," a "medical care facility," a "satellite medical care facility," and/or a "satellite emergency medical facility." The parties disagree regarding the proper construction of the claim term "facility" and the claim term "satellite."

---

[1] At the *Markman* hearing, the Court and counsel discussed the term "image" and whether that term as used in the '288 Patent could include single still photographs. The Court expressed skepticism that the term "image" in the context of "video-conferencing" could include single, fixed photographs. Nonetheless, Emtel has not formally asserted that the term "image" includes single photographs, and the parties have not briefed the issue. As a result, the Court does not at this time construe the claim term "image" as used in the '288 Patent.

The "facilities" referenced in the '288 Patent are the patient locations, which are separate and geographically removed from the physician's location at the video-conferencing station. Emtel argues that the term "emergency care facility" should be construed as any place equipped to carry out emergency care and, likewise, "medical care facility" should be construed as any place equipped to provide medical care. The Court finds this proposed construction to be overly broad. MedAire, on the other hand, proposes that the term "emergency care facility" should be construed as limited to an emergency department at a hospital. The Court finds this proposed construction to include limitations not found in the claims of the '288 Patent.

Having carefully considered the parties' briefing, their arguments during the *Markman* hearing, and the '288 Patent, the Court construes the claim term "emergency care facility" as a location that is intended and equipped for the provision of emergency medical care on an extended basis. The Court construes the claim term "medical care facility" as a location that is intended for, and has the equipment necessary for, the provision of medical care on an extended basis. During a discussion at the *Markman* hearing, the parties compared a major sports arena or convention center used to provide medical care for an extended period of time following a natural disaster, with a home or office that is equipped with a first aid kit or a defibrillator.

For purposes of the '288 Patent, the former could satisfy the requirements for a "medical care facility" while the latter would not.

The parties also dispute the proper construction of the term "satellite" as used in the claim term "satellite medical care facilities" and "satellite emergency medical care facility." Emtel argues that the claim term should be construed as a facility that is associated with but separate from the video-conferencing station. MedAire argues that the claim term requires that the facility share common ownership or an agency relationship with the video-conferencing station. The Court finds no support in the '288 Patent for MedAire's proposal that there must be an ownership or formal agency relationship. The Court agrees, however, that to be a "satellite" facility, as opposed to a mere "facility," there must be an affiliation between a facility and the video-conferencing station. That affiliation, however, is not limited to an ownership relationship, but includes an ownership, agency, contractual, or other similar relationship.

### D.    Claim Terms Relating to "Care Givers"

Claims 9, 14, 15 and 18 of the '288 Patent refer to a "care giver" without a modifier. Claim 1 refers to a "medical care giver" and Claim 4 refers to a "skilled medical care giver." In each claim, the identified type of care giver is located at the medical or emergency medical facility with the patient.

Because the '288 Patent identifies three types of care givers, it is presumed that they have different meanings. The Court construes the term "care giver," when used without modification, to mean a person who routinely provides assistance in the rendering of medical care to another individual. The term "medical care giver" is an individual who has some training, either formal or informal, that enables him to provide medical care to another individual. The term "skilled medical care provider" is an individual who is licensed or certified in a pertinent medical skill. A paramedic and a licensed nurse are examples of a "skilled medical care provider."

### E.      Claim Terms Relating to "Control" by the Physician at the Station

Claims of the '288 Patent refer to the physician at the central station controlling the video image from the facilities (Claims 1 and 9), the video-conferencing system (Claim 1), and the video camera at the facilities (Claims 4, 9, 13 and 15). Additionally, the Background of the Invention, the Summary of the Invention, and the Detailed Description of the Preferred Embodiment sections of the '288 Patent refer to the physician at the central station controlling the care and treatment of the patients at the facilities. The parties dispute the proper construction of the term "control" as used in connection with the video camera at the facilities.

The Background of the Invention section of the '288 Patent describes the medical practitioner at the station having "the capability of independently causing the

video camera to move as desired for efficient visual inspection of the patient" and "the capability of selectively controlling the video-conferencing camera from a remote location." *See* '288 Patent, col. 2. The Summary of the Invention section describes the invention as "enabling the medical practitioner from a remote location to selectively position the camera or its lens equipment as needed to visualize the condition of the patient." *See id.*, col. 3. In the Detailed Description of the Preferred Embodiment section, the '288 Patent states that "the medical practitioner manipulates the electronic controller to thereby adjust the position of the video camera." *See id.*, col. 8. In the same section, it is explained that the "medical practitioner [in the video-conferencing station] is provided with a control unit for controlling operations . . . of the video cameras and lenses" both to conduct a careful examination of the patient and to evaluate the nursing personnel and inspect their "treatment of the patient as instructed by the medical practitioner." *See id.*, col. 8. This explanation indicates that the medical practitioner is controlling the camera from the central station, in part to ensure that the personnel at the facility are treating the patient as instructed by the medical practitioner. The statement does not support Emtel's argument that the camera is "controlled" by the medical practitioner from the station when the camera is manipulated by personnel at the facility as instructed by the medical practitioner.

Claim 4 of the '288 Patent describes the video-camera in the facilities being controlled from the station. Claim 9 describes a "remotely controllable video camera" at the facility with a controller that enables the medical practitioner at the station to control the images from the camera. Claim 13 provides that the video camera at the facilities "can be controlled by said emergency room physician" at the station. In each of these claims, it is clear that the physician at the station controls the video camera at the facilities.

Claim 15 describes a method for delivering medical evaluation services "comprising the steps performed by or on behalf of a licensed medical practitioner." The system used by the medical practitioner includes a "remotely controllable video camera" at the facilities. One of the steps of the method described in Claim 15 is controlling the video camera from said central medical video station. Although Claim 15 indicates that the steps of the method can be performed "on behalf of a licensed medical practitioner," there is nothing in the '288 Patent that indicates that the "remotely controllable video camera" at the facilities can be controlled other than from the station. As a result, Emtel's argument that the video camera at a facility can be controlled at the facility by an individual at the facility acting at the request of the physician is unsupported by the intrinsic evidence in the record and is unpersuasive.

Based on a careful consideration of the intrinsic evidence, the Court construes the term "control," as used in the '288 Patent with reference to the remote control camera at the facilities, to mean that the medical practitioner at the station – either personally or by someone at the station acting on his behalf – manipulates from the station the video camera located at the facility through electronic, radio, or comparable signals. A request by the medical practitioner for someone *at the facility* to position the camera in a certain manner is not "control" of the camera *from the station* and does not involve a "remotely-controllable camera" as required by the claims in the '288 Patent.

### F.    Claim Terms that Do Not Require Construction

There are terms in the claims of the '288 Patent that the parties agree need no construction, or as to which the parties did not argue during the *Markman* hearing for a particular construction. These claim terms are "confer visually and audibly;" "emergency room physician" and related terms; "evaluated substantially simultaneously;" "so as to produce;" "contemporaneously;" and "establishing." The Court agrees that these claim terms do not require construction.

## IV.   CONCLUSION

The Court has considered the intrinsic evidence, including the prosecution history. The Court also has considered the parties' oral arguments and explanations

during the *Markman* hearing, which the Court found very helpful and informative. Based on this consideration of the intrinsic evidence and the parties' arguments, as well as the application of governing claim construction principles, the Court construes the disputed terms in the claims of the '288 Patent as set forth herein.

It is **SO ORDERED**.

SIGNED at Houston, Texas, this **12th** day of **April, 2016**.

_____
NANCY F. ATLAS
SENIOR UNITED STATES DISTRICT JUDGE